United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY SCALA,<br><br>    Plaintiff,<br><br>    v.<br><br>CITICORP INC.,<br><br>    Defendant.     / | No. C 10-03859 CRB<br><br>**ORDER GRANTING MOTION TO DISMISS** |

    Plaintiff fraud victims bring this class action lawsuit charging Defendant financial institutions with a role in a $20 million Ponzi scheme perpetrated by one of Defendants' clients. Specifically, the complaint asserts four claims under California state law: (1) aiding and abetting fraud and fraudulent concealment; (2) aiding and abetting conversion; (3) aiding and abetting breach of fiduciary duty; and (4) violation of state unfair competition laws.

    Before the Court are two Motions to Dismiss filed by Defendants. The first, based on Rule 12(b)(6), seeks dismissal on the ground that the claims are preempted by the federal Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), or in the alternative that Plaintiffs have not stated a valid cause of action because they fail to allege that Defendant had knowledge of the fraudulent activity. See dckt. no. 14. The second, based on Rule 12(b)(7), seeks dismissal alleging failure to join a necessary party. See dckt. no. 12.

    For the following reasons, the Court GRANTS the 12(b)(6) Motion, and holds that all

of Plaintiffs' state law claims are preempted by SLUSA because the securities involved are "covered" by SLUSA and because the Defendants' alleged tortious conduct occurred "in connection with" securities transactions. Because the Complaint is dismissed for failure to state a claim, the Court does not reach the 12(b)(7) Motion.

**I.    BACKGROUND**

Plaintiffs Mary and Sebastian Scala, on behalf of themselves and other victims of an alleged "Madoff-style" Ponzi scheme, brought this suit against Defendants Citicorp, Citibank, and Citigroup (collectively, "Citi") for aiding and abetting in the scheme, perpetrated by Joseph, "Guiseppe" Viola, a Citi client.[1] Plaintiffs also charge Defendants with violations of California business codes. The Complaint alleges as follows.

Joseph Viola, the individual alleged to have actually defrauded the Plaintiffs, was incarcerated for five years during the 1980s following a fraud conviction, and was again indicted on charges related to investment fraud in 1990, but fled while awaiting trial.[2] Compl. ¶ 14. The scheme at issue here began sometime around 2000, when Viola began to hold himself out as an investment consultant who would invest money on client's behalves through accounts held at various financial institutions, including those operated by Defendants. Id. ¶ 17. Plaintiffs allege that Viola fraudulently established such accounts, unlawfully using the identity of a third, now deceased, individual (named Ralph Napolitano) to open accounts at Citi and other institutions. Id. ¶¶ 18, 22. The accounts were then used to collect funds from Viola's intended victims, who were told that Viola intended to employ an investment strategy of trading primarily in futures contracts based on the S&P 500 and on 30 Year Treasury Bonds. Id. ¶ 22. In reality, the accounts suffered heavy losses, as Viola traded almost exclusively in extremely volatile oil futures. Id. Despite the losses, Viola sent false "statements" to victims inflating the value of investments, and sent "distribution" checks to investors purportedly signifying gains. Id. ¶¶ 19, 20, 22. Viola continued sending

---

[1] Viola is not a Defendant in this action.

[2] He has since been extradited to Maricopa County, Arizona, where he remains incarcerated.

2

the "statements" even after he had stopped trading altogether in December 2008, instead diverting funds for non-investment purposes including a venture to design, produce, and sell a sports car. Id. ¶ 22. On August 3, 2010, Viola was indicted on charges of defrauding investors of approximately $7 million, though Plaintiffs allege that actual investor losses exceed $20 million. Id. ¶ 15.

Defendants' role in the matter arises out of their relationship with Viola. Viola had accounts with Citi Investment Services ("CIS") prior to his fraud conviction during the 1980's and his 1990 indictment, but CIS terminated the accounts following an internal audit. Compl. ¶ 25. Despite this knowledge, CIS allowed Viola to establish multiple accounts in 1999 – some under the false name "Giuseppe" Viola, and others titled as trust accounts for Napolitano. Id. ¶¶ 26-27. CIS did not request appropriate identification and violated its own policies as well as federal banking regulations in establishing the accounts. Id. Rik Schramell, a bank officer, was named successor in interest on the Napolitano trust accounts, which Plaintiffs allege also violated banking regulations as well as Citi's internal policy. Id. ¶ 28. Plaintiffs further allege that Defendants deliberately failed to monitor the accounts, including failing to obtain or verify identification and other documents in order to comply with the USA PATRIOT Act, 31 U.S.C. §§ 5318(h),(l). Id. ¶¶ 29, 30. Despite Defendants' knowledge that the account-related documents contained false information, and that Mr. Napolitano had not signed any of the documents, Defendants allowed the accounts to remain open and to be used by Viola. Id. ¶ 31.

Because Defendants employed advanced internal audit procedures, Plaintiffs allege that Citi had actual knowledge that Viola was engaged in fraudulent activity, including operating as an unlicensed investment professional operating in violation of federal and state law. Id. ¶ 32. In October of 2008, following Viola's loss of nearly $4 million in an account with another institution, Defendants sent knowingly false letters of reference to the institution attesting to Viola's integrity and wealth. Id. ¶ 37. Around the same time, Defendants hosted meetings and social functions during which a Citi employee named Roger Ho met with Viola's investors and falsely represented that Viola was a skilled estate planning attorney and

3

investment advisor, and falsely assured attendees that Viola had produced excellent returns on investments. Id. ¶ 38. Ho also told investors that because a Citi officer was successor in interest on the accounts, investors could expect a return of funds in the event of Viola's incapacitation and recommended that investors transfer their portfolios to the Napolitano accounts. Id. Plaintiffs aver that Citi then approved millions of dollars in transfers into the accounts, all the while knowing that Viola was operating a Ponzi scheme – and that Defendants continued to vouch for him despite knowing of his extensive investment losses. Id. ¶ 39. Based on the account activity and known violations of Citi's own internal policies as well as federal regulations including the USA PATRIOT Act, Plaintiffs allege that Defendants had actual knowledge that Viola was using the Napolitano accounts to perpetrate a Ponzi scheme and that they aided and abetted in the scheme. Id.

By July of 2009, the Napolitano accounts at Citi were considerably depleted and Gary Sullivan, Assistant General Counsel to Citibank, phoned Viola and requested that the accounts be closed. Compl. ¶ 40. Sullivan subsequently sent Viola an email detailing Citi's concerns about the accounts and requesting additional documentation. Id. ¶ 41. Viola did not comply, and the accounts were closed on September 30, 2009. Id. ¶¶ 42-43. However, Viola was allowed to establish a separate account titled "SVU Holdings," which Plaintiffs allege was further used to amass investor funds for the purposes of fraud between September 2009 and March 2010. Id. ¶¶ 44-45.

Plaintiffs filed the instant matter on August 27, 2010. Id. at 1 (dckt. no. 1), and Defendants subsequently filed their Motions to Dismiss under Rule 12(b)(7) (dckt. no. 12) and 12(b)(6) (dckt. no. 14). Following oral arguments on January 28, 2011, the Court granted the parties leave to submit supplemental briefs setting forth additional authority helpful to the resolution of the motions. Plaintiffs filed their supplemental brief on February 7, 2011 (dckt. no. 33) and Defendants responded on February 17, 2011 (dckt. no. 35). The Court subsequently solicited supplemental briefing from the parties on the issue of amendment. See dckt. no. 36. The parties each submitted their supplemental briefs on that issue on March 9, 2011. See dckt. nos. 37, 38.

4

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in a complaint. Ileto v. Glock, Inc., 349 F.3d 1191. 1199-2000 (9th Cir. 2003). Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "Detailed factual allegations" are not required, but the Rule does call for sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937. 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007)). According to the Supreme Court, "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949-50. In determining facial plausibility, whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950.

## III. DISCUSSION

**A. The Complaint fails to state a claim upon which relief can be granted**

For the reasons set forth below, Plaintiffs' claims will be dismissed pursuant to Rule 12(b)(6) because of a federal statute barring certain class action suits brought under state law. As such, the Court determines that it is unnecessary to reach the parties' arguments about whether Plaintiffs state valid causes of action under state law, or to address Defendants' Motion based on Rule 12(b)(7).

**1. Plaintiffs' state law claims are preempted[3] by SLUSA**

Defendants' Motion argues principally that all of Plaintiffs' claims are preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), and the Court agrees. SLUSA provides in relevant part :

---

[3] Though the Court and the parties refer to causes of action being "preempted" by SLUSA , this is shorthand. The Court recognizes, as the Supreme Court has, that SLUSA does not technically "preempt" any state law cause of action. Rather, it preempts "the right to use the class-action device to vindicate certain claims." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 87 (2006) (emphasis added).

5

> (1) Class action limitations. No covered class action based on the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging –
>
> > (A) a misrepresentation or omission of material fact in connection with the purchase or sale of a covered security; or
> >
> > (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1). Any such lawsuit is subject to dismissal. 15 U.S.C. § 78bb(f)(2).

Plaintiffs, in their Opposition, contest the application of SLUSA on the grounds that (1) some, but not all, of the securities involved are "covered," and (2) the "in connection with" element is not met. See generally, Opp'n. 11-14. The Court will first describe the history and purpose of SLUSA before turning to a discussion of the merits of these arguments.

### a. History and Purpose of SLUSA

Congress passed SLUSA in order to stem the tide of state law litigation involving securities regulated at the federal level, following the enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). U.S.C. §§ 77z-1, 78u-4. PSLRA introduced heightened pleading requirements, along with other procedural and substantive restrictions, in an effort to "curb abusive and frivolous securities suits." U.S. Mortgage, Inc. v. Saxon, 494 F.3d 833, 841 (9th Cir. 2007). However, PSLRA had an "unintended consequence" – plaintiffs who sought to avoid its hurdles began to file an increasing number of securities-related class actions under state law. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 82 (2006). Three years after the enactment of PSLRA, Congress passed SLUSA, which requires removal and/or dismissal of certain "covered" class actions.[4] Its primary purpose, therefore, is to address concerns that the PSLRA would be thwarted by artful drafting of federal securities class action complaints so as to nominally arise under state law. Id.

---

[4] As discussed below with regard to amendment, a "covered" class action is one that seeks damages "on behalf of more than 50 persons," or brought on a representative basis, regardless of the class size. 15 U.S.C. § 78bb(f)(5)(B). Plaintiffs do not challenge that their action is "covered," as currently pleaded.

6

### b. Plaintiffs' allegations involve "covered securities"

SLUSA defines a covered security as one "that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred ...." 15 U.S.C. § 78bb(f)(5)(E). Section 18(b) of the 1933 Act in turn defines the term to include securities traded on a national exchange. 15 U.S.C. § 77r(b).

If a covered class action brought under state law concerns a transaction involving covered securities at all, it is subject to dismissal under SLUSA – even if it also involves non-covered securities or non-securities.[5] See Kenneth Rothschild Trust v. Morgan Stanley Dean Witter, 199 F. Supp. 2d 993, 1000 n.21 (C.D. Cal. 2002) (fact that plaintiff's claims also related to a certificate of deposit, a non-security, did not place it outside the scope of SLUSA preemption); Lasley v. New England Life Variable Life Ins. Co., 126 F. Supp. 2d 1236, 1238-39 (N.D. Cal. 1999) (state law claims dismissed because they did not "relate solely" to a non-covered security). The Eleventh Circuit is in accord with this approach, having held that claims involving hybrid investment products comprised of both covered and non-covered securities nonetheless involve a "covered security" for purposes of SLUSA. See Herndon v. Equitable Variable Life Ins. Co., 325 F.3d 1252, 1254 (11th Cir. 2003) (per curiam); Instituto de Prevision Militar v. Merrill Lynch, 546 F.3d 1340, 1351 (11th Cir. 2008).

The parties disagree as to whether Treasury Bonds qualify as "covered securities," but neither cites conclusive authority on the question. It is unnecessary to reach these arguments, however, because Plaintiffs allege that Viola initially represented to investors that he would trade in "instruments including, but not limited to, stocks, bonds, mutual funds, futures, options, and other such instruments and derivatives thereof[.]" Compl. ¶ 17. There is no serious dispute as to whether stocks and bonds are "covered securities," and as already

---

[5] Plaintiffs assert in their Opposition that current Ninth Circuit law is "clear" that a mixture of covered and non-covered securities do not trigger SLUSA preemption. Opp at 12. In support of this proposition, Plaintiffs cite Rezner v. Bayerische Hypo-Und Vereinsbank AG, a case addressing neither SLUSA nor the question of "covered securities." See 630 F.3d 866 (9th Cir. 2010). Plaintiffs' suggestion is unsupported and contrary to the weight of authority on the issue.

discussed above, unless a claim relates solely to non-covered securities, it is subject to dismissal under SLUSA. Further, as the Court explains in the following section, it is immaterial what was actually done with the investor funds – only what representations were made in soliciting the funds.

Accordingly, the Plaintiffs' state law claims involve "covered securities" for the purposes of SLUSA.

### c. Plaintiffs' allegations also involve misrepresentations "in connection with" the purchase or sale of covered securities

The parties also heartily disagree as to whether Citi's alleged aiding and abetting conduct occurred "in connection with" the purchase or sale of securities. Plaintiffs have advanced several arguments against finding that this element is met. First, Plaintiffs argue that the complaint does not allege any misrepresentations or omissions on the part of the Defendants. Opp. at 2-3; 11-12; Pl.'s Supp'l. Br. at 11-12. Second, Plaintiffs argue broadly that there is an insufficient nexus between the wrongdoing alleged and the purchase or sale of a covered security to warrant preemption by SLUSA. Id. at 4-5. Third, Plaintiffs advance two related arguments as to aiding and abetting claims: (1) that since there is no private right of action under securities law against a secondary actor, SLUSA cannot as a matter of law preempt aiding and abetting claims, or (2) in the alternative, that aiding and abetting claims at least do not require dismissal. Opp'n. at 12; Pl.'s Supp'l. Br. at 6-11. Finally, Plaintiffs argue that the facts here involve the mere "pledge" of a security, which cannot suffice as a misrepresentation "in connection with" the purchase or sale of a security. Opp'n. at 14. None of these arguments is availing.

The Court first examines the way in which the phrase "in connection with" has been interpreted by other courts in the past, and then addresses each of Plaintiff's arguments.

### i. Construction of "in connection with"

To trigger SLUSA preemption, the alleged misrepresentation, omission, or use of a manipulative or deceptive device giving rise to liability must have occurred "in connection with" the purchase or sale of a covered security. 15 U.S.C. § 78bb(f)(1). In the context of a suit brought under state law alleging fraud, the Supreme Court held that Congress intended a

8

"broad construction" of the phrase "in connection with," positing that even if the alleged fraud merely "coincide[s]" with a securities transaction, the claim must be dismissed under SLUSA. Dabit, 547 U.S. at 85. This interpretation is necessary, because "a narrow reading of the statute would undercut the effectiveness of the 1995 Reform Act and thus run contrary to SLUSA's stated purpose." Id. at 86.

To interpret the phrase "in connection with" in the context of SLUSA, the Court looked to interpretations of the exact same phrase in the context of Section 10(b) (a federal securities fraud provision) and its accompanying regulations. Id. at 85-86; see 15 U.S.C. 78j; 17 CFR 240.10b-5. In so doing, the Court found that Congress was aware of the phrase's broad construction when enacting SLUSA. Dabit at 85. Accordingly, the Court held that Congress must have intended the phrase to sweep broadly, and that the claims in Dabit alleged fraud "in connection with" the purchase or sale of covered securities, despite the fact that the plaintiffs were neither purchasers nor sellers, but brokers. Id. at 89.

To further illustrate the breadth of its interpretation, the Court noted an earlier 10(b) case in which it held that the "in connection with" element would be met, regardless of whether any securities transaction ever actually occurred, so long as the complaint alleged misrepresentations pertaining to such a transaction. Id. at 85 n. 10 (citing SEC v. Zandford, 535 U.S. 813, 819 (2002)). Because Dabit dealt directly with fraud, the Court did not address the phrase "in connection with" in a case alleging aiding and abetting various intentional torts. The Ninth Circuit, however, applying Dabit, has dismissed an aiding and abetting claim as preempted by SLUSA. See U.S. Mortgage, 494 F.3d at 846. Noting that existing precedent requires very broad reading of the term, the Court now turns to Plaintiffs' assertions that their claims falls outside of its scope.

**ii. The Complaint alleges misrepresentations by Defendants**

Plaintiffs' attempt to recast their Complaint as lacking any allegation of misrepresentation is without merit. Plaintiffs plainly allege that the Defendants themselves made misrepresentations or omissions. See Compl. ¶ 38 ("CIS . . . falsely assured [investors] . . . that an officer of CIS . . . would return investors' funds if Viola became incapacitated.

During these meetings, CIS falsely represented [Viola's credentials as an investment advisor] . . . CIS knew that these representations were false"). Indeed, these allegations are perhaps the most important against Citi – they purport to show that the corporation, through its employees and subsidiaries, misled investors by lending Viola an air of legitimacy. The gravamen of the Complaint is that the Defendants actively participated in misleading the Plaintiff victims, causing them to turn over funds to Viola, believing that the funds would be used to purchase covered securities.

### iii. Defendants' alleged wrongdoing is not 'tangential' to a securities transaction

Plaintiffs argue in their Supplemental Brief that SLUSA does not reach every state law claim with underlying allegations of fraud – a broad proposition with which the Court agrees. See Pl.'s Supp'l. Br. at 4-6. As applied to the Plaintiffs' claims, however, the Court cannot agree that the misrepresentations alleged by Plaintiffs are 'extraneous' to the fraudulent securities transaction.

As Dabit makes clear, it is immaterial that the Defendants are neither the purchasers nor sellers of the security. See 547 U.S. at 89. It is equally inconsequential that some or even all of the securities transactions may never have occurred, or that there is no private right of action against secondary actors under existing federal securities legislation. See id. at 85 n. 10 (citing Zandford, 535 U.S. at 819); U.S. Mortgage, 494 F.3d at 846. What matters is that the Complaint, on its face, alleges misrepresentations and omissions that occurred "in connection with" the purchase or sale of covered securities – because, as was the case in Dabit, Plaintiffs' losses resulted directly from what they believed to be legitimate

//
//

transactions involving covered securities.[6]  See 547 U.S. at 89.  For this reason, Plaintiffs' state law claims[7] in the present action are all preempted by SLUSA.

### iv. Class action suits for aiding and abetting may be subject to preemption by SLUSA

Plaintiffs have also urged that an aiding and abetting claim cannot be subject to dismissal under SLUSA, because Section 10(b) does not permit any private right of action against secondary actors.[8]  Opp'n. at 11-12.  However, as mentioned above, the Ninth Circuit dismissed such a claim on precisely the grounds of SLUSA preemption.  See U.S. Mortgage, 494 F.3d at 846.  In their Supplemental Brief, Plaintiffs change course slightly, asserting only

---

[6] That Plaintiffs' losses were a direct result of having chosen to enter into purported transactions in covered securities (based in part on misrepresentations made by Defendants) is what distinguishes this case from many cited by Plaintiffs.  For example, in Anwar v. Fairfield Greenwich, the court found the "in connection element" was not met because there were multiple layers of separation between the "phantom securities" Madoff claimed to be purchasing and the financial interest Plaintiffs directly purchased.  See 728 F.Supp.2d 322, 398-99 (S.D.N.Y. 2010).  The court also noted that SLUSA's policy concerns were not implicated by the case, because Plaintiffs had brought federal claims against Defendants and were not engaging in "federal flight litigation."  See id at 399.  Similarly, the misrepresentations alleged in LaSala v. Lloyds TSB Bank, PLC had only an incidental effect on a covered securities transaction, because the misrepresentations alleged were (1) not made to the investing public, and (2) not made in order to induce the purchase or retention of a security.  514 F.Supp.2d 447, 478-79 (S.D.N.Y. 2010).  A third case on which Plaintiffs rely is still more easily distinguished.  In Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC., et. al., the court found the claim was not preempted because the relevant security, a hedge fund, was not covered by SLUSA – the court had no need to conduct analysis of the phrase "in connection with."  See 2010 U.S. Dist. Lexis 13766 at *8 (S.D.N.Y. Feb. 16, 2010).

[7] Though much of the Court's discussion here has focused on the aiding and abetting claims, SLUSA's preemptive effect applies equally to Plaintiffs' claim based on §§ 17200 and 17203 of the California Business and Professional Code.  In asserting those claims, Plaintiffs incorporate by reference all of the allegations this Court has determined trigger SLUSA preemption.  See Compl. ¶ 79.  That claim is also foreclosed by Bowen v. Ziasun Technologies, Inc., which held that § 17200 does not apply to securities transactions at all.  See 116 Cal. App. 4th 777, 790 (2004).

[8] That does not mean such plaintiffs are foreclosed from any remedy.  As the court noted in U.S. Mortgage: "[P]laintiffs could have completely avoided SLUSA's reach by pursuing their claims in groups of 50 or less or by bringing a federal claim that meets the strict pleading requirements of the PSLRA.  Instead, plaintiffs chose to proceed in . . . state court under . . . state law as an aggregated class of hundreds of plaintiff[s], and it is access to that procedural device that SLUSA denies.  Our empathy for possibly defrauded plaintiffs does not permit us to flout the clear instruction of the United States Supreme Court."  494 F.3d at 845.

11

that SLUSA does not require dismissal of aiding an abetting claims – a conclusion with which the Court agrees generally, but not as applied to these facts.[9]

### v. The wrongful conduct alleged surpasses a "pledge" of securities

Next, in arguing that the "pledge" of a security is not conduct "in connection with" its sale, Plaintiffs rely exclusively on Rezner v. Bayerische Hypo-Und Vereinsbank AG, a case in which the Ninth Circuit held that the "in connection with" element was not met for purposes of Section 10(b) where covered securities were only involved as a result of having been pledged as collateral for an allegedly fraudulent loan. 630 F.3d 866, 871-72 (9th Cir. 2010). However, the Rezner case bears little resemblance to the matter before the Court, primarily because Viola did not "pledge" any securities; the term, as used in Rezner, specifically refers to the use of securities to collateralize debt. Id. at 868. In Rezner, a taxpayer sued firms who encouraged him to take out loans for the purpose of evading taxation – a recommendation that turned out to be fraudulent. Id. at 869. The court held that the plaintiff having pledged an interest in an account holding municipal bonds as collateral for the loans was not sufficient to show that the misrepresentation occurred "in connection with" a securities transaction – and hence, that the claim was not precluded by PLSRA. Id. at 872. Importantly, the court noted that the plaintiff's losses did not result from the pledge of the securities, and that the securities were "merely a happenstance cog in the scheme." Id. That is wholly distinguishable from the present matter, in which the Plaintiffs' losses are the result of having entered into a fraudulent agreement about the purchase and sale of covered securities. Id. at 868. Additionally, as the Court noted in Dabit, representations are

---

[9] Instituto de Prevision Militar v. Merrill Lynch, 546 F.3d 1340 (11th Cir. 2008), a case cited by both parties, is particularly instructive on this point. The factual allegations bear a striking similarity to the instant case – plaintiffs essentially alleged that the financial institution made misrepresentations to investors, lending credibility to a non-party actor who ultimately misappropriated funds plaintiffs believed were to be used in purchasing covered securities. Id. at 1342-43. Contrary to Plaintiffs' reading of the case, the court did not adopt a new "sort of test" requiring that preempted claims be actionable by the SEC under 10(b) or Rule 10b-5. Instead, the court used the range of activities covered by 10(b) and Rule 10b-5 as a measure of what "at minimum" could be considered "in connection with" the purchase or sale of a covered security. Id. at 1348. Finding in that case that the defendants' conduct could be actionable by the SEC, the court dismissed all state law claims, including alleging aiding and abetting liability, as preempted by SLUSA. See id. at 1353.

12

1  considered to have occurred "in connection with" the securities transaction regardless of
2  whether the transaction ever actually takes place. Dabit, 547 U.S. at 85 n.10.

### 2. Plaintiffs may amend to avoid SLUSA or to comply with PLSRA

The final issue before the Court on this Motion is whether, given that all of Plaintiffs' state law causes of action cannot be maintained in their current form due to SLUSA, Plaintiffs should nonetheless be given leave to amend the Complaint so that the suit is no longer a "covered class action." The Court holds that they should.

SLUSA provides three separate definitions of a covered class action:

> (B) Covered class action. The term "covered class action" means–
>
> (i) any single lawsuit in which–
>
> (I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members;
>
> or
>
> (II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members;
>
> or
>
> (ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which–
>
> (I) damages are sought on behalf of more than 50 persons; and
>
> (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B).

The Complaint currently falls within the scope of both subsection (B)(i)(I) and subsection (B)(i)(II). The Complaint alleges that the number of putative class members is in excess of 60, making it a "covered class action" under 15 U.S.C. § 78bb(f)(5)(B)(i)(I). See Compl. ¶ 55. Additionally, the suit has been brought by parties on a representative basis on behalf of themselves and other unnamed parties – making it a "covered class action" under

13

15 U.S.C. § 78bb(f)(5)(B)(i)(II), regardless of the putative class size. However, it is not inconceivable that there might exist some form of amendment that will cure the defects in the Complaint that now require dismissal. The Court therefore reserves its opinion as to the sufficiency of a hypothetical future complaint and instead dismisses the instant Complaint without prejudice. If Plaintiffs wish and are able to plead causes of action in a form that will not require dismissal under SLUSA, they must do so <u>within thirty (30) days of this Order</u>.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss based on 12(b)(6), without prejudice. The Court does not reach the 12(b)(7) Motion.

**IT IS SO ORDERED.**

Dated: March 15, 2011

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE